IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SHAUNA JOHNSON, DARRYL STINGLEY, and DENISHA WHITTLE, | § § § | |
| Plaintiffs, | § § | |
| | § | CASE NO. 4:06CV81 |
| v. | § § | |
| KEYHOLE ROAD ASSIST, INC., | § § § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are Defendant Keyhole Road Assist, Inc.'s Motion for Summary Judgment as to claims asserted by Plaintiffs Shauna Johnson and Denisha Whittle [Dkt. No. 24] and Defendant Keyhole Road Assist, Inc.'s Motion for Summary Judgment as to all claims asserted by Plaintiff Darryl Stingley [Dkt. No. 25]. Plaintiffs Johnson and Whittle have asserted Title VII claims for race discrimination, retaliation, and hostile work environment against Keyhole. Plaintiff Stingley asserts Title VII claims for race discrimination, harassment, and retaliation. Keyhole provides motorist assistance, primarily to those drivers who lock themselves out of their cars. Drivers are dispatched by Keyhole to assist the stranded motorists. Keyhole refers to these drivers as "independent contractors" and does not consider the drivers employees of the company. Whittle and Johnson are African-American women formerly employed as dispatchers by Keyhole. Plaintiff Stingley was an African-American driver for Keyhole. All Plaintiffs seek treatment as Keyhole employees under Title VII.

Having considered the motions, Plaintiffs' response, Defendant's replies to Plaintiffs' response, and all the evidence properly before it, the Court is of the opinion that Defendant's motions for summary judgment should be granted.

**Background**

Keyhole, in its motions, states its version of the facts that led to the Plaintiffs' terminations. Plaintiffs Johnson and Whittle were hired by Keyhole as dispatchers and began working for Keyhole on September 12, 2005. Johnson had heard about the position from Whittle, with whom she had maintained a friendship for about two years prior to their hire. Whittle and Johnson were both hired at a rate of $7.50 per hour, which was increased to $8.00 per hour after they completed training.

Both Whittle and Johnson were hired to provide dispatching for Keyhole for the evening shift, which generally ran between 2:00 p.m. and 12:30 a.m. Whittle and Johnson's duties as dispatchers included accepting dispatch calls, dispatching drivers, and data entry. Whittle and Johnson were employed by Keyhole for a total of thirty-two days, until October 14, 2005, during which time they worked a total of twenty-four days each. During these twenty-four days, Whittle and Johnson worked together every shift that they were employed by Keyhole. Both Whittle and Johnson were supervised in their dispatcher duties by Trudy Pawson. Ralph Pawson, Vice-President of Keyhole, was more involved with the independent contractor drivers, was not in the office for the majority of Whittle and Johnson's employment and had little contact with Whittle and Johnson.

On October 10, 2005, Whittle and Johnson reported to Keyhole at approximately 2:00-2:30 p.m. to work the evening shift. Given that this day was a Monday, the office was especially busy with a high volume of calls resulting in a back-up of paperwork. Immediately upon entering the Keyhole office, both Whittle and Johnson began to throw papers around, slam down their purses and

cell phones, and make comments under their breath. Whittle and Johnson then began complaining to the members of the morning shift, using profanities, and stating that the work was not completed, and they were not going to be responsible for completing the morning shift's work. Plaintiff Johnson specifically told dispatcher William Stovall she was not going to do any work left over from the morning shift. The disruption got to the point where office manager, Mark Celeste, was forced to step in and ask everyone to calm down and get to work. Celeste considered sending Whittle and Johnson home for the day; however, he decided to let them stay at work with the hope that the hostilities they had created with the morning shift would lessen as the members of the morning shift left for the day.

A few hours after the morning shift left, Carol Panich, a dispatcher from the morning shift, was at her home across the street from the office, when she received a telephone call from Plaintiff Johnson. Panich had earlier let the dispatchers from the evening shift know that she was available to help, if needed. During the brief phone call, Plaintiff stated, "How are you going to say to call you when you need help and tell people that you are not going to answer the phone when we call? All I have to say to you, Carol, you're a fake a** b**ch." Plaintiff Johnson then hung up the phone.

Panich then placed a telephone call to Trudy Pawson, President of Keyhole, who was in Arizona for business. In this conversation, Panich relayed the earlier confrontation that had occurred between Whittle and Johnson with the morning shift, as well as informed Pawson of the call from Plaintiff Johnson in which Johnson referred to Panich as a "fake a** b**ch." In addition, Panich, who has been employed with Keyhole since its inception, informed Pawson that she would resign her position as dispatcher if forced to work with Whittle and Johnson.

Through the evening of October 10, 2005, there were only three dispatchers on duty at

Keyhole — Whittle, Johnson, and Krystalyn Peters. At some point in the evening, Plaintiff Whittle contacted an independent contractor driver, David Britt, for a service call. Britt initially declined the call, and Plaintiff Whittle became upset when another dispatcher called Britt and he accepted a job from the other dispatcher. A little while later, Plaintiff Johnson attempted to dispatch Britt for a job, which he declined, but again later accepted from another dispatcher. At this point, Plaintiff Whittle got angry and began calling other independent contractor drivers to tell them about the dispatchers' problems with Britt.

Around this time, Trudy Pawson received a telephone call from Britt, in which Britt stated he was not dispatched correctly and when he addressed the issue, he was treated rudely. Britt indicated that he did not know exactly which dispatcher had treated him poorly, but he knew that it was either Johnson or Whittle. After speaking with Britt, Pawson received another telephone call from Lillian Burcham, the wife of another independent contractor driver. Ms. Burcham informed Pawson that she had been called by either Whittle or Johnson and was also treated extremely poorly when Ms. Burcham informed them that her husband was unavailable to take a call because he was changing a flat tire.

Pawson then spoke with Krystalyn Peters, who informed her that things were again beginning to escalate in the office. Peters told Pawson that problems had escalated in the office to the point where Johnson and Whittle were not doing any of their work, were not answering calls, and were calling and talking to other people about the problems with the drivers. During this call with Pawson, Peters placed the telephone on the table in the office to allow Pawson to listen while Whittle and Johnson spoke on the phone with other people. While the phone was on the table, Pawson could hear Whittle and Johnson both talking on the telephone to unknown individuals (but clearly not

4

customers of Keyhole), complaining loudly and making various derogatory statements about the independent contractor drivers.

After Pawson hung up with Peters, she received a telephone call from Whittle, in which Whittle told her that the drivers were not doing their jobs and someone was going to have to come in and make the drivers do their jobs. Pawson told Whittle to calm down and try to work as a team to everything done, and Pawson would look into everything when she returned from Arizona.

Later in the evening, Whittle had another confrontation over the phone with William Myre, an independent contractor driver. Later, Myre came by the Keyhole office and had a more serious confrontation with both Whittle and Johnson. During this confrontation, Whittle admits to yelling profanities at Myre, and Johnson admits telling Myre that he "looks like a Ku Klux Klan member." When Myre attempted to leave the office, Johnson stood at the top of the stairs, yelling profanities at him. After Myre left, Whittle and Johnson got on the phone to call their boyfriends and tell them about the confrontation with Myre. The other dispatcher, Krystalyn Peters, saw Whittle and Johnson on the phone with their boyfriends and heard one of them say they wanted the boyfriend to come to the office to "kick this Aryan Brotherhood mother f***er's a** when he comes in to turn in paperwork some night."

After the altercation with Myre, Johnson called Pawson, spoke to her for approximately thirty minutes, and said there had been a face-to-face altercation between Whittle, Johnson, and Myre when he had come to the office to turn in paperwork. Pawson told Johnson that she and Whittle needed to clock out and go home early from their shift, and Pawson would investigate everything when she returned from Arizona. Instead of heeding the directive from the President of the company, Whittle and Johnson stayed at the office for approximately three additional hours each, incurring 1.7 hours

of unauthorized overtime in the process. At no point during Pawson's conversation with Johnson did she express any regret or acknowledge any fault for the incidents that occurred that evening.

From October 11, 2005 through October 13, 2005, Pawson conducted face-to-face and telephone interviews with dispatchers from the morning shift (Carol Panich, Laura Ovalle, William Stovall), Krystalyn Peters from the evening shift, office manager Mark Celeste, as well as various drivers who had contact with Whittle and Johnson on October 10, 2005. Pawson spoke at length with Peters, the only other dispatcher on duty that evening, and was told by Peters that Whittle and Johnson had been on the phone all evening complaining to various people about the problems with independent contractor drivers. Further, Peters informed Pawson that, after the confrontation with Myre, she witnessed Whittle and Johnson get on the phone to their boyfriends and heard them tell a boyfriend to come up to the office and "kick this white Aryan Brotherhood mother f***er's a**."

Upon questioning Myre about the evening, he stated that Whittle and Johnson made racist statements to him when he came into the office, and he responded by calling them "black b**ches." Myre indicated he regretted making the comments to Whittle and Johnson but maintained he did so only in response to various derogatory comments made toward him.

On October 13, 2005, Pawson received notice from four employees in the office stating that they would not continue to work with Johnson and Whittle and would be resigning if there was no action taken against them. In addition, several independent contractor drivers informed Pawson they no longer wanted to contract with Keyhole if Whittle and Johnson were allowed to continue dispatching for Keyhole. Pawson thereafter consulted with Celeste and made the decision to terminated the employment of Whittle and Johnson based upon the events of October 10, 2005.

On October 14, 2005, Whittle and Johnson reported to work at approximately 2:00 p.m. and

were informed by Pawson and Celeste that their employment with Keyhole would be terminated. Both Whittle and Johnson subsequently applied for unemployment benefits with the Texas Workforce Commission ("TWC"). In response to the TWC's inquiry into their employment, the individuals present on the evening of October 10, 2005 were asked to provide statements to the TWC regarding what they had observed during that afternoon and evening. After the TWC investigated the circumstances surrounding their termination, both Whittle and Johnson were denied unemployment benefits.

The plaintiffs contend that they were in essence fired on trumped up charges. Both point to racial slurs uttered by a driver. Whittle and Johnson state that they were fired after complaining that the driver called them black b**ches. Both testified that he used foul, racist insults. Johnson admits that she used profanity after listening to the driver's diatribe. She admits that she told the driver he looked like a Ku Klux Klan member. Johnson and Whittle deny ever using the term Aryan or white Aryan to refer to the driver. Plaintiffs claim that Trudy Pawson's, Keyhole's president, refusal to investigate the claims before they were fired and the refusal to dismiss her husband or driver for making racial remarks indicates a fact issue preventing summary judgment in this case.

As with Plaintiffs Johnson and Whittle, a brief background as to Plaintiff Darryl Stingley's claims against Keyhole is instructive. In late September 2005, Stingley entered into an agreement with Keyhole to work as a driver and provide roadside assistance services. As part of his agreement with Keyhole, Stingley signed a "Contract Service Agreement" with Keyhole, stating that he was not an employee pf Keyhole, but instead would act as a subcontractor with Keyhole, as Keyhole worked with motor clubs to provide roadside assist services to drivers.

The genesis of Stingley's complaint against Keyhole stems from an offensive racial slur

uttered by Keyhole's owner, Ralph Pawson. From the evidence reviewed, Pawson had problems with Stingley's phone greeting which contained a rap musical greeting. Pawson also had complaints about Stingley's work habits and alleged damage to one of Keyhole's customer's vehicle. On November 26, 2005, Pawson called Stingley on Stingley's cell phone and, according to Stingley, left the following message in a "faux rap" voice:

> "Hey this is your boss man, Ralph. You are being pulled from the Board. You're not doing any jobs. Come turn in my tools. Get rid of your f *****g  n *****r sounds and g** damn paint cause my customers, they complain. You're being fired. Bring me your stuff, now. Yo this is the boss...... Complain. You're fired. Bring me your stuff now. Yo, this is the boss."

Stingley did not make any other service calls for Keyhole after this date, and their relationship was terminated.

## Standard

Federal Rule of Civil Procedure Rule 56(c) provides that the Court may only grant a motion for summary judgment when there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to

point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. *Id*. Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Id*.

Summary judgment is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987). The district court must look to the full record, including the pleadings, affidavits, and depositions. *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir.1988). Under this standard, fact questions are considered with deference to the nonmovant. *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). The evidence of the nonmovant is to be believed and all inferences are to be drawn in his favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). The Court resolves factual controversies for purposes of summary judgment in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *Little v. Liquid Air Corp.*, 37 F.3d at 1075. The Court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1048 (5th Cir. 1996) (*citing Little v. Liquid Air Corp.*, 37 F.3d at 1075).

An issue is "genuine" if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inference in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of the party. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987). A "material fact" is one that might affect the outcome of the suit under governing law.

*Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S. Ct. at 2510.

## Defendant's Summary Judgment

**A.     Plaintiffs Johnson's and Whittle's Race Discrimination Claims**

Under the *McDonnell Douglas* burden shifting framework, a plaintiff alleging racial discrimination under Title VII has the initial burden of making a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973); *see also Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004). A plaintiff makes a prima facie case if she establishes that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside the protected class or that similarly situated individuals outside the protected class were treated more favorably. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001). *See also McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824 ; *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998).

Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. If the defendant articulates a legitimate reason, then the burden shifts back to the plaintiff to establish that the defendant's reason was pretextual and discrimination was the true motivation. *See Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001).

A Title VII plaintiff can also establish unlawful employment discrimination under a mixed-motive theory using either direct or circumstantial evidence. *See Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 310 (5th Cir. 2004). The mixed-motive analysis is conducted using a "modified

*McDonnell Douglas*" test, under which, after a defendant has offered nondiscriminatory reasons for the adverse employment action, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that the defendant's reason, while true, is only one of the reasons for its conduct and that another motivating factor was the plaintiff's protected characteristic. *Id*. at 312.

Plaintiffs Johnson and Whittle present no evidence or argument to rebut Keyhole's claim that they have failed to establish a prima facie case of discrimination. Both Plaintiffs' positions were filled by minorities. Therefore, no prima facie case can be shown. Keyhole is entitled to summary judgment on this ground.

**B.      Plaintiffs Johnson's and Whittle's Hostile Work Environment Claims**

To prevail on a title VII hostile work environment claim, a plaintiff must prove that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment of which she complained was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *Frank v. Xerox Corp*., 347 F.3d 130, 138 (5th Cir. 2003). Hostile work environment claims based on racial discrimination are reviewed under the same standard as are those based on sexual discrimination. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. 10, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

According to Whittle's and Johnson's deposition testimony, the only racial insult directed to them involved the incident with the driver. Both state there were no other racial comments made in their month-long employment with Keyhole.

For harassment to affect a term, condition, or privilege of employment, it must be subjectively and objectively abusive. *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325

(5th Cir. 2004) (*citing Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). Plaintiffs state that the remark was subjectively abusive to them. Whether an environment is objectively hostile or abusive is determined by considering the totality of the circumstances. *Harris*, 510 U.S. at 23, 114 S. Ct. at 371. Although no single factor is required, courts look to the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, whether it unreasonably interferes with an employee's work performance, and whether the complained-of conduct undermines the plaintiff's workplace competence. *Hockman*, 407 F.3d at 325-26.

Here, as Plaintiffs concede, there was one remark directed toward them. The remark was by one of the drivers and appears to have been an isolated incident. The Court does not believe this remark to be physically threatening or humiliating but rather more of the nature of an offensive utterance. Although the rest of the remark could certainly undermine Plaintiffs' workplace competence, when viewed under the totality of the circumstances, the Court finds that such remark was not objectively hostile or abusive. "Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment." *Scales v. Slater*, 1818 F.3d 703, 712 (5th Cir. 1999). Keyhole is entitled to summary judgment on this ground.

C.     **Plaintiffs Johnson's and Whittle's Retaliation Claims**

Plaintiffs also contend that they have established the elements of a prima facie claim for retaliation. A plaintiff may prove a retaliation claim through direct or circumstantial evidence. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414 (5th Cir. 2003). In most cases, the employer does not explicitly state a retaliatory purpose for discharging an employee. Ms. Pawson did not state

12

a retaliatory reason for Plaintiffs' discharge. Without direct evidence, the plaintiffs must establish their cause of action using circumstantial evidence and the *McDonnell Douglas* burden-shifting framework. *Id*. at 415. Each plaintiff must show the following three elements: (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and adverse employment action. *Fierros v. Tex. Dept. of Health*, 274 F.3d 187, 191 (5th Cir. 2001). If the plaintiff establishes a prima facie case, then the defendant must show a non-retaliatory, legitimate reason for the adverse action. Once the defendant meets this burden, the plaintiff must in turn offer evidence to create a genuine issue of material fact that the defendant's reason is not true, but is instead a pretext for discrimination. *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (*quoting Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. *Burlington N. and Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414, 165 L. Ed. 2d 345 (2006). Title VII does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283-84 (1998). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 848 (1997). It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Id*. Normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. *See* 2 EEOC 1998 Manual §8, p. 8-13; *Burlington N. & Santa Fe Ry. Co.*, 126 S. Ct. at

2415.

There is no evidence that any co-worker with influence over the ultimate decision maker, Pawson, engaged in any discrimination. The only remark was that of an independent contractor driver, and it does not appear he took any steps to try and force Plaintiffs' termination. One other co-worker testified that she would quit unless the Plaintiffs were terminated. There is no evidence that this was motivated by racial animus.

The term "black b\*\*ch" is appalling and unnecessary and, at least when addressed to an African-American by a person of a different race, is reasonably understood to have no other purpose than to express racial animus. *Canady v. John Morrell & Co.*, 347 F. Supp. 2d 1017 (N.D. Iowa 2003). Nevertheless, statements and actions of ordinary employees are normally not imputable to the employer. *Long v. Eastfield College*, 88 F.3d 300, 306 (5th Cir. 1996); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S. Ct. 1775, 1804-05, 104 L. Ed. 2d 268 (1989) (O'Connor, J., concurring) ("[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden...."). Nevertheless, when the person conducting the final review serves as the "cat's paw" of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact. *Long*, 88 F.3d at 307 (*quoting Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990)). The ultimate question, therefore, is whether "the employee can demonstrate that others had influence or leverage over the official decision maker." *Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001) (*quoting Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2001)).

The Court finds that Plaintiffs Johnson and Whittle arguably have met the test for prima facie

14

retaliatory discharge in that they reported the conduct and were terminated almost immediately. Therefore, the burden is on Keyhole to articulate a legitimate, non-retaliatory reason for their termination.

Keyhole cites a number of reasons for their termination — multiple confrontations with other employees and drivers, derogatory comments concerning drivers, using profanity in regard to another employee, calling a driver a member of the KKK, asking their boyfriends to come over and deal with the "white Aryan Brotherhood mother f***er's a**."

The Plaintiffs dispute most of the reasons given by Pawson. They do not appear to dispute that Johnson called one of the dispatchers a "fake-a** bit**"; that there was some confrontation with the other dispatchers over those dispatchers not completing their work; that Whittle got upset with one of the drivers, Britt, for being out of an area for taking a call; and that she used profanities at the driver who made the racist comment.

The issue is whether Plaintiffs can show that the reasons given were just a pretext or even, if true, whether race was one of the reasons for their termination. In the end analysis, is there a fact issue that the reporting of an isolated derogatory remark by a non-employee lead to Plaintiffs Johnson and Whittle's termination? Having reviewed all the evidence submitted, the Court believes that there is no such showing.

Keyhole's motion as to Plaintiffs Whittle and Johnson is granted.

**D.      Plaintiff Stingley's Claims of Race Discrimination, Harassment, and Retaliation**

Keyhole argues that there is no Title VII liability in that Stingley was not an employee and, if he is an employee, he was terminated on the basis of a legitimate, non-discriminatory reason. Given the language presented to the Court and the evidence of prior complaints concerning

15

Stingley's choice of music, the Court finds that there is a fact issue as to discrimination if he is an employee. If he is not an employee, however, Stingley has chosen the wrong avenue for redress. *See generally Johnson v. Crown Enterprises, Inc.,* 398 F.3d 339 (5th Cir. 2005); 42 U.S.C. § 1981.

Title VII contemplates some employment relationship in discharge cases. It is also clear that whether a person is "an employee under Title VII is a question of federal law; it is to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand." *Calderon v. Martin County,* 639 F.2d 271, 272-73 (5th Cir.1981). As *Calderon* suggests, there is simply not much statutory guidance on who is an employee. Title VII defines an employee as "an individual employed by an employer." 42 U.S.C. § 2000e(f).

In *Broussard v. L.H. Bossier, Inc.,* 789 F.2d 1158 (5th Cir. 1986), the Court looked to the economic realities test identified in *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979) to analyze whether an individual is an employee for Title VII purposes. Under this test, the right to control is the most important factor in determining employee status. *Broussard*, 789 F.2d at 1160. Evidence of control over a job includes: ownership of equipment necessary to its performance, responsibility for costs associated with operating that equipment and for such things as license fees and taxes, responsibility for obtaining insurance, responsibility for maintenance and operating supplies, ability to influence profits, length of job commitment, form of payment, and directions on schedules and on performing work. *Id.* The right to control, although the most significant factor, is not alone determinative. *Spirides*, 613 F.2d at 831. According to *Spirides,* additional factors that are relevant include: (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the

particular occupation; (3) whether the employer or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer;" (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties. *Id.* at 832; *Broussard*, 789 F.2d at 1160. Applying these factors, the Court makes the following findings.

1. Ownership of equipment: Stingley was responsible for his own cell phone and vehicle (at first, he rented the vehicle and tools). (Exh. F/52)(35)

2. Responsibility for costs of equipment: Stingley was responsible for such costs (Exh. D)

3. Furnishing place to work: there is no evidence that Stingley worked at Keyhole.

4. He was responsible for the full deductible in any accident.

5. He was paid a commission by the job.

6. He was entitled to no unemployment benefits pursuant to his agreement with Keyhole.

7. There is no evidence that he was entitled to vacation pay or medical, etc. (Exh. F/49).

8. He was given a Form 1099 reflecting his commissions, and no taxes were ever withheld.

9. There is no evidence that he was entitled to retirement benefits.

10. Keyhole did not pay FICA taxes on Stingley.

11. The parties signed an agreement that expressly stated he was not an employee of Keyhole.

12. He did not work under the direction of a supervisor.

13. He had no set schedule of work (Exh. F/43).

14.     He could turn down jobs (Exh. F 44).

15.     He had to pay for his own gas and truck maintenance (Exh. F/49).

16.     It appears that he also worked for himself or a family member during this time.

17.     He did not file for unemployment.

Stingley states that the following demonstrate that he was, for all purposes, an employee: Pawson used the word "fired"; Keyhole taught him the skills needed for the job; Keyhole controlled his work-life (Keyhole would call and wake him up; Keyhole would call and tell him that he was needed somewhere; if he wanted to eat or go to the restroom, he would have to call Keyhole); Keyhole did not welcome a driver turning down a job; *if* he had a business card, he would have to put Keyhole's name on the card; he had to wear a Keyhole shirt furnished by Keyhole; and he referred to Pawson as the boss or "boss man."

After considering the factors noted above, the Court finds that Stingley was not an employee and therefore cannot prevail on his claim under Title VII. As the Court notes, Stingley may not be without some redress for Pawson's offensive and reprehensible conduct, but such redress does not come under Title VII.

Defendant's motion as to Stingley's claims under Title VII is granted.

### Recommendation

Based on the foregoing, the Court recommends that Defendant Keyhole Road Assist, Inc.'s Motion for Summary Judgment as to claims asserted by Plaintiffs Shauna Johnson and Denisha Whittle and Defendant Keyhole Road Assist, Inc.'s Motion for Summary Judgment as to all claims asserted by Plaintiff Darryl Stingley be GRANTED.

Within ten (10) days after service of the magistrate judge's report, any party may serve and

file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c)).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 4th day of May, 2007.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE